May it please the court, my name is Paul Manassian. I'm appearing today for the Firebaugh Canal Water District and the Central California Irrigation District, who are the parties responsible for the land's downslope of the St. Louis unit. I'd like the court to imagine we're 30 years in the future, and the ghosts of Judge Scalia and the ghosts of Congress are off in the corner, and they're asking, what did we do wrong? What did we wrote? Because I don't think Judge Scalia would ask that. Because the district court tells us that there is a duty to protect the four corners of the St. Louis unit lands only. Now, the district court's construction is wrong for several reasons, but it's also wrong because looking at what is going to happen, we see that this is not what Congress intended, and it is not a reasonable construction of the act. Now, that doesn't mean that you're supposed to look into the future and predict what's going to happen and prevent it from happening, because that's just exactly what And you see a desert in the future, right? Yeah, well, we know that civilizations collapse because it's glorious to provide water to Iraq, and it's obvious that what is out of sight, the human decision-making process has trouble dealing with. So let's take the ghost to Congress. Congress said, how could we have been any more specific? How could we have said anything more clear about what we intended the discrete duty to be? We included the feasibility report in the act. We have a feasibility report which is laid before Congress before any money is appropriated. Congress can reject that. It did not. It incorporated the feasibility report within the act. And that feasibility report says nothing about restricting the activities of collection, interception, and disposal to the four corners of the San Luis unit. It says nothing about our object is only to protect the airability of the San Luis unit. It's okay if the 30,000 acres of our clients that have been irrigated for 60 years previous, it's okay if they're put out of business. It doesn't say anything like that. Now, the Judge Scalia ghost says to us, but be careful, court. Be absolutely clear that the language was specific enough that the executive can define the duty it has. And be specific and be clear that we said specifically what was to happen in order to make sure that you don't overstep that principle, that we don't want the courts running the executive. Judge Scalia's ghost will tell us that he's just as much aware of the problem of bureaucrats obfuscating or trying to remove a requirement of an act. Congress provided a coordinated, clear, discrete duty here. It wasn't a duty to put the water in a particular place. Obviously, you dealt with that in 2000. How do you define that particular discrete duty specifically? To collect, intercept, and dispose of the drainage water generated by irrigation of the San Luis unit. What's the language that the district court ran into that stopped you cold? Okay. The district court took the language of the San Luis Act and said, when the Congress said, meet the drainage requirements of the San Luis unit. Unit. That's the problem. As generally outlined in the report. Okay? The district court said that puts a four square. Right. And obviously, we have a rule of construction, don't we? Which is, we take every word of the statute, and we have to give every word, if possible, meaning. You read Judge Justice Scalia's book. I believe, too. But, Judge. You're a true believer. But what I believe is that the district court, on this last day of its service and notable service. I mean, Judge Wainter, Wainter. Yeah. We're not trying to make light of this. This is a terrible problem that everybody has. I know. But let me help you. Okay. Okay. And obviously, there's a requirement in the Act itself. It says, before you start constructing the irrigation works, you shall provide, made provision for constructing the San Luis interceptor drain. Now, that Congress, you have interpreted, the majority interpreted in 2000, had given some flexibility to where the water went. But the 2000 decision and Congress's action didn't give any flexibility that the duty was to collect, intercept, and dispose of the drainage water. Does the 2000 decision of which I was a part win this case for you? What's the takeaway from that case? Well, it does. Because you've determined what the Act required in light of the appropriations bills. And if I might just, Judge. And the answer is, you've determined that the statute is not ambiguous. You've determined that the Appropriations Act simply gave some discretion to where the water would be disposed of. But nowhere in either the feasibility report or the 2000 construction of the Act did you say, it's okay not to intercept, collect, and dispose the water if it doesn't damage the upslope lands. Just so I understand. Do I understand your argument correctly to be that the drainage obligation is coextensive with the appropriation obligation? So to the extent that water is appropriated, it has to be the drainage obligation is coextensive with that. Is that your argument? Well, that's part of the argument. Clearly, that was Congress's intention. I don't think counsel from the other side would argue. And there's no question that the Bureau abused the direction that Congress gave it. It built the works. It went to court in 1963. And we can't engage it without drainage. Yeah. You know, you could talk to anybody in the Mideast and you'd say, well, we're not going to make that mistake. But the question is, who's responsible for the drainage? Everyone agrees that there has to be some drainage. The question is, who's responsible for the drainage facilities? Who has to? Congress was very explicit about that, Judge Rawlinson. It didn't say the local districts will take care of it in the upslope area. It recognized this is a monumental challenge. It left it to the king, the United States. Now, so what language in the statute are you relying upon to say that the Congress explicitly put drainage obligations upon the Bureau outside the San Luis unit? What language specifically imposes that obligation? Okay. So when we start with the meet the drainage requirements of the San Luis unit. Unit. And immediately before that, it says construction of the San Luis unit shall not be commenced until the secretary has made provision for constructing the San Luis interceptor drain to the delta. But that's all tied in with the unit, though. I mean, if you look at all of that language together, it appears to be confined to the unit. Not outside the unit. That's the problem I'm having with your argument. No question that we are 50 years after the act. No question that the drainage water has fully saturated the soil upslope and is moving downslope. No question the water is going to be, the drainage water is going to be located downslope. Now, the problem that you're having is the Congress didn't say, hey, if any of that water gets outside of the San Luis unit, you go get it, secretary. All right? But he did. In section 5. This authorizes the action. It doesn't mandate it. Right. It's discretionary. You're absolutely right about that. And yet, when you look through the feasibility report incorporated in the act, do you see anywhere language that says, oh, it's okay to create a nuisance or a trespass downstream? And I expect the courts are going to ask, well, how much drainage do they have to provide? Clearly, Congress did not say to itself, you know, I think those guys over there in the interior are going to ignore us, and they're going to provide water and not provide drainage. We better put something into the act or in the feasibility report. You do acknowledge there's a difference between section 1 and section 5, and you're not suggesting that section 5 is superfluous. No. No. But they would have you read section 5 as simply unrelated to what Congress intended. And you're required, as I understand the rules of construction, to look at the whole statute and gather and pull from that the intention of Congress. Now, the intention of Congress was not to create a swamp on the downslope lands. No question about that. And the district court, you know, uses the words, this is not a remediation statute. All right. It's clearly a preventative statute, but it creates duties. And the duty in this case is not to just protect from drainage damage the four corners of the San Luis unit land. It is to avoid the creation of a drainage problem in the whole area. The problem is that it's hard to reconcile that reading of the statute with section 5, which is discretionary outside the unit, which appears to confer discretion to the secretary outside the unit. Okay. I would suggest to you that it isn't hard at all, that you would not demand of Congress that it anticipate that the bureaucrats over in Interior would intentionally ignore the direction, the very detailed direction. So why would they have to say in the act, in order to make their intention clear in section 5, it's mandatory. You'll pick up all the drainage water that escapes. Because when you look at the feasibility report, it says they will avoid the occurrence of conditions which could possibly impact the downslope, and they said you won't start construction of the irrigation works until drainage is provided for. Now, the ghost to Congress is saying, look, we got a system here. We can't let bureaucrats, when we are specific about what we want people to do, let them carve out the language and ignore it. What can the out-of-unit people do if, in fact, there's not going to be any drainage coming to them under the act? I mean, do they have any remedy? Where would they be? They'd be between a rock and a hard place? You're talking. They could do certain things to get drainage, can't they? Yes, absolutely. And they are. And to their credit, that is, the upslope landowners are trying. What are they doing specifically to deal with their problem? Okay. And this is why I want to bring you back to don't just advocate the direction of Congress. The Secretary is responsible for this. And you're saying to yourself, but look, you're putting the poor district court in this terribly frustrating position. The upslope people won't sign a repayment contract. The, you know, the Bureau says it's going to cost $2.6 billion. It says we've got to go to Congress. Somehow Congress has to act. Congress didn't say you don't have to provide drainage if it's not economic. I thought Judge Block's question was, what are the upslope people doing? Here's what they're doing. They're trying to control the drainage water so that it doesn't damage their land. And they're cooperating with the downslope people to provide a drain that goes through a refuge to the San Joaquin River. Guess what? We've got till 2019 for that drainage. Guess what? That record shows that the Secretary position is we are going to leave it up to the locals to solve this drainage problem. There's a letter in the record to Senator Feinstein says our plan up to 2019 and after 2019 when all drainage has to be stopped from this 100,000 acres. Our plan is leave it up to the local entities. Now, the King has to fill in my lack of knowledge. In 2019, what happens? The state of California has determined that all drainage, surface drainage, the drainage that appears in the drainage, remember two categories. One pipe migrates to the San Joaquin River. Other appears on farmland and is taken away. 2019, the state of California discharge permit says you shall stop all surface water drainage to the tributaries of the San Joaquin River. So who is the you? You is the Grassland Bypass Group, which is some of the upslope landowners within the Penoche Water District, Penoche Drainage District, and Firebaugh and portions of CCID called the Camp 13 area. About 100,000 acres have been using this drain. And if you look at Judge Wenger's decision, you basically say to yourself, well, what's the responsibility of the secretary to provide for drainage after 2019? That there isn't. Basically, the secretary's duty is to provide for drainage for the four corners of the San Luis Union only. Now, I guess I'm a little unclear. My apologies, because we just don't have these problems in Brooklyn. What can I tell you? But I just wonder what the practical effect of this upon the folks. Let's assume that there's not going to be drainage that's going to be required here, as you would like us to hold. Just what happens then? The irrigation will continue, I suspect. Something will be happening by somebody doing something, I guess, to resolve this problem. I mean, you don't have to necessarily depend upon the government, do you? It's a very good question. And the ghost of Congress and Judge Scalia would say to you, look, the problem here is we have to be able to tell the executive what to do. When we tell them what to do, it becomes their responsibility to do it. Now, I don't know the answer to my question. I understand you're claiming people are responsible in all of this type of stuff, but I want to know what happens if that were not. Okay, well, here's what happens. The ground will go out of production eventually. They will struggle. They will shut off the drain. They will comply with California law because there are no treatment plants, because the Bureau's still doing its tests. And the Department of the Interior, gee, we can't get a repayment contract. Well, if we don't have a repayment contract, we can't meet this control schedule. So effectively, what has happened is we won't have drainage. And this will be like Mesopotamia. You will say to yourself, the ghost of Congress, excuse me, will say, what was that court- A possibility for drainage to be supplied through some other mechanism or means, is what you're saying. There's absolutely much that can be done with money. And with leadership. Congress decided who the leader was going to be. The locals recognize this as was said earlier, and it's Congress. All right? But Congress has not said the Secretary isn't responsible. Congress never said, if you don't get repayment contracts from the upslope people because they don't think they can afford it, you don't have to provide drainage. It all comes down to money, I guess, doesn't it? Well, it does. And Congress, in theory, everything comes down to money. But Congress has been very specific here. The feasibility report says you will bill the upslope people for operation and maintenance of the project. It is said that all necessary drainage is part of operation and maintenance. We have a Supreme Court case on that. Now, if Congress says to operate and maintain this thing, and if the Bureau said, we can get enough money out of the locals to pay for the drainage system, and they've decided to change the drainage system to something that's more expensive, more complex, that's their right. But until Congress redrafts the Santa Luis Act and says, stop, there's not enough money to do this, we want to sacrifice that downslope land, we don't want you, Secretary, involved in this, you don't seem to be able to handle this duty, until Congress says that, the district court is in error in construing drainage requirements as not including the requirement to operate and maintain the project due drainage with irrigation.  We'll give you one minute for rebuttal. So is there going to be a splitting of time? Yes, Your Honor. My name is Brian Toth from the Environment and Natural Resources Division of the Department of Justice. My apologies, let me interrupt. What happens to these four people? You posed the question, what are the upslope drainers doing to provide drainage? And the answer, which ties into your question you just asked, is that they are reducing the source of the drain water by using more efficient conveyances in their irrigation delivery through irrigating, for example, with drip irrigation through the lining of canals that are now open ditches, so less water is lost for irrigation purposes, less drain water is generated as a result. The entities that use the grassland drainage area, such as Firebaugh, do by 2019 have to comply with State water quality requirements in discharging their drainage water into the San Joaquin River, and the intent is to eliminate the discharges altogether of drain water. Now, that's to be achieved through not just what Firebaugh is doing, but what other entities are doing in the northern area of the unit. Okay, so just so our record's clear, who do you represent, and then you need to tell us who else is going to be arguing so we can have complete. My name is Brian Toth, I represent the United States. I intend to discuss the APA claim. My colleague from the Civil Division, Mark Stern, is here if the Court has any questions about the Federal Tort Claims Act. We intend to speak for 12 minutes for the government. The Westlands Water District, represented by Eric Robinson, intends to speak for five minutes, and then Mr. Hal Candy for the Environmental Intervenors will speak for three. All right. So, since the Court last saw this case in 2000, Interior has taken seriously this Court's order and the subsequent District Court order that it provides ranged to the San Luis unit. It's taken that order seriously, and it went back to the District Court, proposed a plan of action that included discrete items, the steps that it would take to do the studies necessary to make decisions about how to manage drainage. Is that the feasibility study? No, there was a series of studies leading up, required by the National Environmental Policy Act, leading to an environmental impact study. That led to an actual decision by Interior in 2007 to adopt a drainage management plan, a comprehensive plan that addresses drainage management within the unit, and also pursuant to the discretionary authority in Section 5, addresses interrelated drainage systems on portions of my opponent's land. But opposing counsel is saying that your obligation extended, obligation, not discretion, extended beyond the unit. What's your response to that? The response is that if you look to the text of the Act, it doesn't speak to that clearly in the way that is necessary to give rise to a duty under 706-1. And there has been case law in this Court since Sua against Norton fleshing out what is meant by discrete duty, and that's the Hell's Canyon case that we cite in our brief that provides that in order to give rise to a mandatory duty claim, the action has to be one such as was traditionally enforceable through the obtaining of a writ of mandamus in equity. And so the... But what are these people supposed to do? I mean, if their land is being flooded by water and nobody's draining it away, is it fair to say that the conditions are caused by the irrigation that's in the San Luis unit? That's disputed. That's a factual dispute and the parties dispute that the cause of their drainage problems is, in fact, the application of irrigation water upslope. Well, let's assume that's the case. Assuming it is, I mean, their recourse. First of all, the plan that was adopted, as I just mentioned, does in Interior's discretion cover portions of the drainage systems on Firebaugh and provide drainage to it. But your position is that it need not do anything. Well, it did that. It already – Interior already acted and made the decision to do that within its discretion. But the difference is whether Interior is subject to ongoing supervision, supervisory powers of the district court to hold it in contempt if it doesn't do certain things with respect to Firebaugh's lands outside the unit. It's already on the hook for lands within the unit, as to Wesley. So I understand. Your position is that as far as lands outside of the unit, you can just do nothing if you choose to do so in your discretion, that you don't have to do anything. As a matter of law, it's a duty that's not enforceable through 706-1. It's a mandatory duty. You're performing these charitable deeds, so to speak, out of the largesse of your heart, so to speak, and you're giving them some drainage, but you're going to decide how much, if any, in the future they're going to get. Is that your position? Well, respectfully, Your Honor, the plan that was adopted does more than that. It addresses – Are you bound to follow that plan? The plan has been decided, and it can be challenged. I mean, there's not a – there's never – they have not challenged the plan itself as arbitrary and capricious, and – But your position is that under the statute, you have discretion. You're not mandated outside the San Luis unit to do any – undertake any drainage obligations. That's correct. Well, then how can they challenge it as arbitrary and capricious if they have no standing to do so, because they're outside of the unit? Well, I'm not sure about the standing question. How could they challenge it as arbitrary and capricious or otherwise in violation of the law if you say, as a matter of law, they're outside of the unit? I suppose I'm speaking more of a claim that they might have based on record facts, that the agency didn't make a decision that was adequately supported by the record. How could they do that? If you're right about your construction of the statute, it only applies to in-the-unit activities. Well, I'm not here to outline a new claim for them, but – Well, you just said they could. I'm interested in how. Well, I think they could have – they could have raised a 706-2 challenge to the plan itself as arbitrary and capricious and contrary to the – A piece of discretion that you abused your discretion under the statute? Based – that we acted arbitrary and capriciously based on the record – whatever record facts were submitted during the course of those proceedings. And they would have standing and there would be jurisdiction to entertain such a challenge? I don't want to commit to that right now. I mean, I haven't – Because I think it's wrong. Well, I'm – I would just – If you're right about the statute. Well, for the – Okay. Now, you're talking about this plan that was developed after Fireball 1 and all that stuff, right? And that went through the NEPA process? That's correct. And did the NEPA process incorporate the negative effects that it would have on people outside of the unit? Yes. The Interior Department prepared a full-blown environmental impact statement, hundreds and hundreds of pages. In addition to the preliminary studies that looked at effects outside the unit. And, in fact, they were providing drainage to some lands outside the unit. So they, of necessity, had to look at those drainage needs. Did NEPA, as a – whatever you want to call it, a mitigation requirement, mandate that the – that Reclamation take – you know, deal with the problems of the outside people? They adopted – a portion of their plan covers their lands because they are interrelated and the drainage systems are interrelated. But you seem to be – maybe I'm missing something fundamental. You seem to be creating the problem by providing irrigation, but not resolving the problem when it comes to the necessary drainage. Well, let me – to address that question, and I hope this will get to your concern as well, I want to go back to something my opponent was saying. He continues to focus on the duty of collecting, intercepting, and draining the lands. But that is nowhere found in the statute. And it pertained to a problem that Congress perceived – it was over 50 years ago. And the nature of that problem has changed. Interior is no longer building an interceptor drain to intercept, collect, and drain the waters here. It is undertaking, you know, at Congress's direction, an in-valley solution to dispose of the drain water in minor quantities after reducing – first, reducing the number of acres that require drainage through land retirement, throughout the unit. That reduces the amount of land that's irrigated in the first place, and thereby reduces drain water. Second, as the lands that are actually irrigated, there's source reduction, more efficient irrigation. That minimizes the amount of drain water that's generated. Drain water that does percolate down and is not taken up by crops or otherwise evaporates is reused on salt-tolerant crops.  through these treatment plants to remove selenium and other trace elements, to remove the salts, and then the remaining salts will be evaporated and disposed of, if necessary. The only things that are happening, I suspect, but what does the court do with all of this? I mean, what's our responsibility under, you know, Subdivision 5 and under Subdivision 1? Let me just digress. Maybe that's a good choice of words here. When you're dealing with Subdivision 1, is it your position that the courts do have supervisory responsibility over that, but they do not have any supervisory responsibility under Subdivision 5? Is that your position? Because of the decision in 2000, Interior acknowledges that it has a drainage duty under Section 1. You feel you're bound by that decision in light of the Supreme Court decision in Norton? We haven't repudiated the decision. So you're willing to comply with that? That's correct. And we are, through the adoption of the 2007 Drainage Management Plan. And we've proffered a control schedule. You don't think that Norton really changes the legal landscape in respect to that? You're still bound by Firebaugh, and you're willing to comply with that, notwithstanding Norton was sued, that's correct. I do think Norton changes the legal landscape, but I think that's water under the bridge. I mean, the United States decided not to seek certion. I'm sorry for that nonintentional pun. I didn't the United States did not seek certiorari in the 2000 Firebaugh case. So you're bound by it, you'll live with it? We're bound by it, and we're complying with it. And the district Do we accept that as some sort of a concession by counsel that you're willing to abide by, notwithstanding the Supreme Court's decision, you're still willing to concede and be bound by the prior decision? Oh, we are. We are. We're under the district court's continuing jurisdiction and have submitted and are subject to a control schedule, submit biannual status reports, and the district court has the opportunity to enforce that. So the district court said that, you know, you haven't acted reasonably or that you have. The district court has said that, you know, your actions are all right, your adversary says that you're dragging your feet, you're not doing enough, so to speak, I guess. But there's a determination that the district court, as a matter of law, said that your actions were not unreasonable. Isn't that a factual matter for the court to determine under the, what's it, the track standards to make a factual assessment? How do you justify this decision as a matter of law? I'm a little bit unclear about that. Well, under 706 You seem to be so factually involved. Right. I'd separate the track case that you're talking about from the D.C. Circuit deals with unreasonable delay and there are certain equitable factors that the court assesses in determining whether there's been unreasonable delay. But the way it was said as a matter of law, there was no unreasonable delay. I don't understand how he gets to that position as a matter of law. Well, as a matter of law, I think that legal claim went to unlawfully withheld. 706-1 deals with actions unlawfully withheld or unreasonably delayed. He said there's no legal duty unlawfully withheld as to lands outside the unit. That's evident from Section 5. Right. Section 5. I'm talking about within the unit. Right. Within the unit, it's a factual matter. You're right, for the district court. And what the district court did was it said, look, I've looked at these things. I entered a control schedule. There's no dispute that Interior is complying with it. And on appeal, we don't hear a firebar arguing that the entry of the consent schedule was an abuse of discretion. So there's really not much left to do to say whether there's been unreasonable delay in providing drainage within the unit. We've acknowledged that duty and we're continuing to comply under the district court's supervision of that. So, counsel, you're approaching 12 minutes. Yes, Your Honor, unless the Court has an additional question. I'll turn the presentation over to my colleague. All right. May it please the Court. My name is Eric Robinson and I'm appearing this morning on behalf of Westlands and the other San Luis unit districts, which are Appalese in this case. Counsel for the firebar plaintiffs alleges in its Fifth Amendment complaint that the plaintiffs have applied irrigation water, their own irrigation water, to their lands for more than 100 years, that they have drainage problems, and that they want the Department of the Interior to solve those drainage problems for free. That's what the case is about. The practical effect of this case is that if this court were to reverse the district court's decision and hold that Interior has a mandatory duty to provide drainage outside of the San Luis unit, the solution that the San Luis Act provides in Section 5 would be rendered a nullity and it wouldn't be implemented. Plaintiffs contend that San Luis Act Section 1A imposes a mandatory duty, but nowhere in Section 1A did Congress actually say that Interior had a duty to provide drainage outside of the San Luis Act. Opposing counsel suggests that the reference to the 1956 feasibility report indicates that Congress expressed such a duty, but when one looks to the feasibility report citations provided by opposing counsel, one sees no language describing any such duty to lands outside the San Luis unit. In fact, none of the record evidence cited anywhere in plaintiff's opening brief or reply brief says anything about a mandatory duty to provide drainage outside of the San Luis unit under Section 1A. Well, how about the fact that, you know, Judge Wenger has been supervising this and counsel here just said that they accept the fact that there is, you know, it's appropriate for the district court to be involved in the supervision and I assume the ongoing supervision. There could be other lawsuits later on depending upon differences in circumstances. Are you taking a different position? You're saying that sewer really countermands fire bow and that there is no responsibility whatsoever left to the district court to supervise or manage these matters? Absolutely not. The Ninth Circuit's 2000 decision affirming the district court's decision that Section 1A of the San Luis Act It stands. That still stands. It stands. It's raised judicata and it is being implemented. That is not the question at issue today. The question at issue is an expansion. You're not dealing with Norton at all. Just forget about that. Well, actually, I think that the Southern Utah Wilderness Alliance case and the Hells Canyon case are both instructive as to the claim, as to the Administrative Procedure Act claim that is actually at issue in this appeal. And those two cases teach us the italicized language in SEWA by Justice Scalia teaches us that there is no mandatory duty unless you can look into the statute and find language expressly describing one and nowhere in the opening reply briefs of opposing counsel can one find such language. And so SEWA and Hells Canyon teach us that the district court was correct in dismissing the plaintiff's Administrative Procedure Act claims based on a summary judgment motion. So what's the basis of the district court's ongoing supervision here? The court's ongoing supervision is with respect to the Department of the Interior's duty to provide drainage to the San Luis unit for the lands within the San Luis unit. That is what the district court has continuing jurisdiction to enforce pursuant to the judgment entered after the 2009 circuit opinion. That's a mandatory duty, specific discrete function and responsibility? That is correct. You look at the language of Section 1A. I'm sorry. You look at the language of the San Luis Act, Section 1A. There's a duty to provide drainage for the San Luis unit, for the irrigation of the lands within the San Luis unit. A partial judgment was entered. And that's a discrete duty, and that's not at variance with SEWA. You say that's consistent with SEWA. That's correct. And it's res judicata. I thought you said before there was no mandatory. Maybe I'm just confused about it. There's no. As far as outside under Section 5, even within the unit, you say there is no mandatory duty or there is? Your Honor, there is a mandatory duty. And what is that now? The mandatory duty under Section 1A of the San Luis Act, as this court held and as the district court's partial judgment that's been entered holds, says the San Luis Act, Section 1A, obligates the Department of the Interior to provide drainage to the lands within the San Luis Act, and that is res judicata. I understand your position that it's res judicata, but I guess an intervening Supreme Court decision could change the dynamics of all of that. But doesn't that sound like a general responsibility rather than the focused, discrete obligation under SEWA? The intervening Supreme Court decision and the subsequent Ninth Circuit decision applying that rationale on a different set of facts in the Hell's Canyon case do apply here, and they are relevant. And the way in which they apply is to disposing of the fireball plaintiff's claim that they have a mandatory, that they are owed a mandatory duty to drainage outside of the San Luis Act. And let's just think about practical implications. That's been a theme in all of the oral arguments this morning. And one of the practical implications of granting the appellant's request for relief here is that you would be nullifying Section 5. There is a reason, there is a practical reason why Congress enacted Section 5 to provide discretion for drainage services outside of the San Luis Unit. I started off my presentation by noting that the Fifth Amendment complaint alleges irrigation of the Firebaugh and Central California Irrigation District lands for more than 100 years and that they have drainage problems. Interior has discretion to enter into an agreement with the Firebaugh and Central California Irrigation District to provide for a drainage solution that addresses irrigation of their own lands with their own water. It's just that the Firebaugh plaintiffs, in the course of that agreement, will have to pay for that drainage service. There will have to be a parsing of responsibility for whose drainage is caught. It needs to be managed. One minute, 24 seconds. Did you intend to give your colleagues any time to speak? I do. The one last point I'd like to make is that it is also important for this Court to confirm that all of the claims against the San Luis Unit districts have been adjudicated by the district court. There's been some indication in the reply brief that the Torr claims may not have been fully litigated, but those were raised in the appellant's opening brief, even if they're walking away from those in the reply brief. And it needs to be clear that those claims have been finally resolved. If it's not clear, this case is never going to end. Section 5 will never be fulfilled, as long as there's a hope of free drainage service. Thank you, Your Honor. All right. You'll let the colleague 44 seconds. Thank you, Your Honor. My name is Hamilton Candy. I'm here on behalf of the Environmental Intervenors. Just a few quick points in response to the discussion before. First of all, the Ninth Circuit remanded the matter back to the district court. The district court modified the injunction, the judgment, in light of the opinion. And there have been a series of actions by the government in response to that injunction. And when the fireball plaintiffs said that the duty inside the unit was being unreasonably delayed under 706-1, the district court found that's not true. In fact, it's undisputed on the record before the district court that the current control schedule is being implemented. Second, it's acknowledged by all of the parties that part of what the government's doing right now is participating in the Grassland Bypass Project. That does benefit the fireball and CCID lands. That does benefit the northerly areas. So there is already, under Section 5, under this authorization to participate, already there is benefit happening. Finally, the question was, doesn't the fireball argument on the APA render Section 5 superfluous? If they say that all of the duty to the northerly areas is read into Section 1A, why do we have Section 5? And I think that's exactly right. That's what the district court found, is that Section 1A speaks to the obligations within the unit, Section 5 speaks to the fireball lands and other areas outside of the unit. If, unless the Court has questions for me, I think I've used up most of my time. It appears not. You're over time, actually. Thank you. Thank you. We'll give you one minute for rebuttal. But one thing I wanted to ask you is whether or not the state law claims are still in play. Yes, they are. And you can imagine Judge Scalia in the Congress looking at you and saying, you actually affirmed the district court that it was permissible to bar the downslope lands that are doing fine, but for the selenium, salinity, and quantity of water flowing downslope. They're doing fine, as far as drainage is concerned, for 60 years before the Bureau violates the requirements of the San Luis Unit. The answer is that it's clear that we have a right to claim nuisance and trespass for the corpus of drainage water that is proceeding downslope and adding to our soil profile. And Congress has been very clear in U.S. v. Olson that there is no immunity for governmental agencies that somehow trumps the FTCA right to pursue against the Bureau of Reclamation. Well, wouldn't the discretionary function exception preclude those if whether or not to provide the drainage is a discretionary decision by the federal government? Why wouldn't that be within the discretionary function exception? It wouldn't apply here because in the San Luis Act itself, it referred to the feasibility report and it referred to controlling and disposing of the water generated by irrigation within the San Luis Unit. It refers to the quantity of water being taken care of, if you will. And so the duty is the corpus of water has to be controlled and disposed of. We're not asking for drainage service for some preexisting problem that we have. The Congress was very clear what the duty was applied to the corpus of the water. Now, Argos asks you, how could you possibly affirm a judgment that there has not been unreasonable delay as a matter of fact? The Congress said the drainage was to be arranged concurrent with the construction of the irrigation facility. We understand your argument. Thank you. Thank you to all counsel. The case just argued is submitted for a decision by the Court and we are on recess until 9 a.m. tomorrow morning.
judges: Block, Trott, Rawlinson